UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN CHRISTOPHER LEE,

|  | |  |
|---|---|---|
| Petitioner, | | Case No. 2:18-cv-10991 |
| | | Hon. Laurie J. Michelson |

v.

CONNIE HORTON,

Respondent.

---

## OPINION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS AND DENYING MOTION FOR RELEASE ON BOND

---

In 2012, two women attempted to leave a house party late at night. Someone shot at their car as they drove away, striking one woman in the head but not killing her. A few weeks later, the two women were abducted and briefly able to communicate by text message from the trunk of the car where they were held. A few weeks later, police ultimately located their bodies and an autopsy determined that they had been shot in the head at close range.

Petitioner Brian Christopher Lee and his co-defendant Brian Cain were convicted for the initial shooting and subsequent homicides in two separate jury trials in Wayne County Circuit Court. For the shooting on the night of the party, Lee was convicted of two counts of assault with intent to commit murder, MICH. COMP. LAWS § 750.83, and commission of a felony with a firearm. MICH. COMP. LAWS § 750.227b. He now challenges that conviction in this petition for writ of habeas corpus under 28 U.S.C. § 2254. Lee was also convicted after a second jury trial of murdering the two women. That conviction is the subject of a separate, pending federal habeas proceeding. *See Lee v. Horton*, Eastern District of Michigan Case No. 19-cv-10313.

1

In this case, Lee raises six claims challenging his assault convictions: (1) his right to a public trial was denied when members of the public were expelled from the courtroom during jury selection, (2) the trial court erred in referring to the complainants as "victims" and the alleged location of the crime as the "scene of the occurrence," (3) he was constructively denied his right to counsel when his attorney failed to interview any of the prosecution witnesses prior to trial, (4) his counsel was ineffective for failing to request a jury instruction directing the jury not to convict him based on "guilt by association" to his co-defendant, (5) his trial counsel was ineffective for failing to object to the closure of the courtroom, and (6) his appellate counsel was ineffective for failing to present the foregoing claims on direct appeal.

The Court will deny the petition (ECF No. 1) because the claims are without merit. The Court will also deny Lee a certificate of appealability, and it will deny his motion for release on bond (ECF No. 18).

## I.

The Michigan Court of Appeals recounted the evidence presented at Lee's  assault trial:

> On February 8, 2012, at about midnight, [co-defendant Brandon] Cain picked up Marlin Church in Cain's black Town and Country minivan. Lee, Glen Hunter, Jr., and Ashley Conaway[5] were also in the vehicle. Cain drove this group to the Sphinx Club, a topless bar. The group met Justin Simmons and Andre Douglas, who is Church's uncle, at the Sphinx Club. Cain, Church, Lee, Hunter, and Douglas consumed alcohol at the club. At about 2:00 a.m., Cain left the club in his minivan with the same individuals that he arrived with. Douglas left the club separately driving a white Buick Century. Both vehicles traveled to Church's house on Glastonbury in Detroit. Douglas pulled into the driveway first, followed by Cain. Church was intoxicated and not feeling well, so he fell asleep inside of the minivan. Conaway also remained inside the minivan, while the others exited the vehicle. Conaway reported to police that Cain started to act "crazy," so Conaway called her friend, Abreeya Brown, to pick her up. When Brown arrived, Conaway exited Cain's vehicle and got into the passenger seat of Brown's car.
>
> Cain then approached the driver's side of Brown's car and asked Conaway if she was going to let him drive her home or leave with Brown. Conaway responded that Brown would drive her home because she had school the next day.

2

Cain then unsuccessfully tried to take the keys out of the ignition of Brown's vehicle. Cain called over Lee, who was standing nearby, and asked Lee whether he had his gun on him. Lee responded in the affirmative. Cain then directed Lee to first shoot the driver, and then "shoot up" the car, if Brown and Conaway drove away.[6] Cain commented that the women could roll up the window of the car and decide what they were going to do. Cain also stated that he had "already beat two murder cases" and that he would make Conaway and Brown the third. Brown was too scared to drive, so Conaway offered to drive instead. The women switched seats, and Brown lowered her head and upper body while seated in the passenger seat. As Conaway drove away, Lee fired two shots into the air followed by seven shots at Brown's vehicle.[7] The back window of the car was shattered and one of the rear tires flattened. Conaway was struck by a bullet fragment in the back of the head.

Church awoke to the sound of gunshots coming from behind the minivan in which he was sleeping. Church looked out of the windows of the minivan and saw a black car with a shattered back window driving away. Hunter and Douglas were on the sidewalk near the house. As Church exited the passenger side of the minivan, he saw that Lee was holding a handgun and that Cain was walking toward the driver's side of the minivan. When Church asked Lee what happened, Lee told him not to worry about it. Lee then got into the passenger seat of the minivan and Cain got into the driver's seat, and the two men drove away in the opposite direction from where the women's vehicle was headed.

The women drove to Sinai-Grace Hospital in Detroit. Conaway reported to law enforcement that Cain told someone named "Little B" to shoot.[8] After the shooting, Cain allegedly offered both Conaway and Brown $5,000 each if they did not testify against him. Before the trial, on February 28, 2012, both women were abducted and were later found murdered. Cain and Lee were two of five individuals charged with those crimes.[9]

—

[5] Cain and Conaway were in a relationship, and Hunter is Cain's brother.

[6] Evidence was also presented that Cain specifically told Lee to shoot Conaway and Brown, as opposed to their vehicle.

[7] Nine bullet casings fired from a 9 mm pistol were recovered from the scene, and a firearm expert determined that the bullets were all fired from the same gun.

[8] Lee is also known as "B.B." Although a witness testified that Hunter was known as "Little B," Lee does not dispute his identity as the shooter on appeal.

[9] This Court peremptorily reversed Cain's conviction and sentence resulting from the abductions and murders of Conaway and Brown and remanded the matter to the trial court for a new trial because the jury was improperly sworn. *People v. Cain*, unpublished order of the Court of Appeals, entered May 2, 2014 (Docket No.

314342). A similar motion for peremptory reversal was filed by Lee regarding his conviction and sentence resulting from the abductions and murders, but was held in abeyance pending the Michigan Supreme Court's disposition of the application for leave to appeal, or the resulting appeal if leave is granted, filed by Cain. *People v. Lee*, unpublished order of the Court of Appeals, entered August 22, 2014 (Docket No. 316110).

*People v. Lee*, 2015 WL 1814035, at *1-2 (Mich. Ct. App. April 21, 2015) (ECF No. 5-12, PageID.1392–1403).

Lee, Cain, and two other men were prosecuted and convicted for the murder and abduction of Brown and Conaway. In affirming the convictions, the Michigan Court of Appeals further found:

> Defendants' convictions arise from the abduction, torture, and murder of best friends, 18-year-old Abreeya Brown (Brown) and 21-year-old Ashley Conaway, after they refused to discontinue the prosecution of defendants Cain and Lee for a separate shooting incident weeks earlier. Brown and Conaway were abducted on the evening of February 28, 2012. They were placed in the trunk of a vehicle and, for a short while, were able to use their cell phones to communicate with friends and family members from their location in the trunk, but they were not seen or heard from afterward. On March 24, 2012, the police found the victims' bodies buried in shallow graves in Eliza Howell Park. Autopsies revealed that each victim had been shot in the head at close range.

*People v. Lee*, 2016 WL 146029, at *1 (Mich. Ct. App. Jan. 12, 2016).

Following his assault conviction, Lee filed a claim of appeal. His appellate counsel filed a brief on appeal that raised a single claim:

> I.   The evidence was not legally sufficient to prove intent to kill beyond a reasonable doubt. Mr. Lee's 14th Amendment right of due process requires the assault with intent to commit murder convictions be reversed.

Lee also attempted to file a pro se supplemental brief that raised claims that now form his first, second, fourth, and fifth federal habeas claims. The time for filing the brief had expired, so Lee filed a motion for an extension of time to file the supplemental brief. (ECF No. 5-12, PageID.1511-48.) The Michigan Court of Appeals denied the motion for an extension of time, and

4

it rejected the supplemental brief as untimely. (*Id.*, PageID.1550.) The court thereafter affirmed Lee's convictions in an unpublished opinion that addressed the one claim raised in counsel's brief. *Lee*, 2015 WL 1814035.

Lee then filed a pro se application for leave to appeal in the Michigan Supreme Court along with a motion seeking permission to raise the pro se claims that he had attempted to raise in the Michigan Court of Appeals. The Michigan Supreme Court granted the motion to add the new claims but denied leave to appeal because it was "not persuaded that the questions presented should be reviewed by [the] Court." *People v. Lee*, 869 N.W.2d 606 (Mich. 2015) (ECF No. 5-13, PageID.1595).

Lee then obtained his current counsel, and he filed a motion for relief from judgment in the trial court. (ECF No. 14-1.) The motion raised the same six claims Lee presents in his federal habeas petition.

The trial court issued an opinion dated December 13, 2016, purporting to deny the motion, but the court seemed to have conflated Lee's two sets of underlying convictions. (ECF No. 5-14, PageID.1847-57.)[1] The opinion erroneously stated that Lee was challenging his jury trial convictions for four counts of second-degree murder. (*Id.*, PageID.1847.) The trial court then referred to the issues raised by Lee in the direct appeal from his murder convictions, discussed the issues presented in the motion for relief from judgment challenging his murder convictions, referred to the evidence presented at the murder trial, and did not separately address the issues raised with respect to the assault trial. (*Id.*, PageID.1850–56.)

---

[1] Lee also had filed a motion for relief from judgment in his murder case, and there was considerable overlap between the issues raised in the two motions. *See Lee v. Horton*, No. 19-10313, ECF No. 6-32.

Lee filed an application for leave to appeal the assault conviction in the Michigan Court of Appeals, raising the same set of claims he raised in the trial court. (ECF No. 5-14, PageID.1719–1774.) The Michigan Court of Appeals denied relief "because defendant has failed to establish that the trial court erred in denying the motion for relief from judgment." (*Id.*, PageID.1716.)

Lee then applied for leave to appeal to the Michigan Supreme Court, where the trial court's failure to address the post-conviction claims for the assault conviction was finally recognized. In lieu of granting leave to appeal, by order dated May 16, 2018, the court remanded the case back to the trial court to "address the issues in the defendant's motion for relief from judgment that the defendant filed in Wayne CC: 12-003376-FC [the assault case], which were not addressed in the court's December 13, 2016 order denying the motion." (ECF No. 5-15, PageID.1876.)

Meanwhile, before receiving that order from the Michigan Supreme Court, Lee filed the present federal habeas petition on March 27, 2018. (ECF No. 1.) After the Michigan Supreme Court issued its remand order, the Respondent warden filed a motion to hold the order requiring it to respond to the petition in abeyance pending the remand proceeding and subsequent exhaustion of state court review. (ECF No. 4.) The Court granted the motion and directed Lee to file an amended petition within thirty days of completion of the state post-conviction review proceedings if he failed to obtain relief in state courts. (ECF No. 6.)

Lee filed an amended habeas petition on March 8, 2019. (ECF No. 8.) The motion revealed that on October 29, 2018, the trial court had issued a second opinion denying Lee's motion for relief from judgment, as ordered by the Michigan Supreme Court. (*Id.*, PageID.1963.) Lee included a copy of the trial court's order. (*Id.*, PageID.1969-1979.) The trial court, however, had simply repeated its earlier error. It acknowledged that the case had been remanded for consideration of

the claims raised in Case No. 12-003378-FC (the assault trial) but it again addressed the issues raised in Case No. 12-005176-FC (the murder trial). (*Id.*)

Deciding that he had given the state courts a fair opportunity to pass on his claims, Lee moved to proceed in federal court in lieu of pursuing another round of appeals in the Michigan appellate courts, and filed his amended petition. (ECF No. 8, PageID.1963–64.) The warden filed a responsive pleading (ECF No. 13), and the matter is now ready for decision.

**II.**

The Antiterrorism and Effective Death Penalty Act (AEDPA)—28 U.S.C. § 2254 in particular—"confirm[s] that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). Thus, if a claim was "adjudicated on the merits in State court proceedings," this Court cannot grant habeas corpus relief on the basis of that claim "unless the adjudication of the claim . . . resulted in a decision" (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A threshold question in this case is whether the state courts adjudicated any of Lee's claims on the merits. The Supreme Court has held that "[w]hen a state court rejects a federal claim without expressly addressing that claim," a federal habeas court must "presume"—subject to rebuttal— "that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). The presumption of a merits adjudication may be rebutted "when a state court rejects a federal claim 'as a result of sheer inadvertence.'" *Brown v. Romanowski*, 845 F.3d 703, 711 (6th Cir. 2017) (quoting *Johnson*, 568 U.S. at 303).

Finally, when asking whether a state court reached the merits of a claim, a court "'looks through' unexplained orders to the 'last reasoned' decision of the state courts," *Brown*, 845 F.3d at 711 (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991)), presuming that any summary affirmances from higher state courts "adopted the same reasoning" of the last reasoned state-court decision in the absence of a showing to rebut that presumption. *Wilson v. Sellers*, 584 U.S. __, 138 S. Ct. 1188, 1192 (2018).

Four of Lee's habeas claims were raised for the first time in the Michigan Supreme Court on direct review, when that court granted Lee's motion to add issues. The court, however, declined to review the claims when it denied Lee's application for leave to appeal because it was not "persuaded that the questions presented should be reviewed by [the] Court." *Lee*, 869 N.W.2d 606 (ECF No. 5-13, PageID.1595.). Because the Michigan Supreme Court expressly stated that it did not review Lee's claims, and there was no lower court reasoning to look to because Lee raised the claims for the first time before the Michigan Supreme Court, the presumption of a merits adjudication does not apply. Lee's claims were not adjudicated on the merits by the Michigan Supreme Court on direct review.

Lee then returned to the trial court and presented all of his federal claims in a motion for relief from judgment. But the trial court did not address those claims because it erroneously conflated the assault case and the murder case and only addressed the issues with respect to the murder convictions. The Michigan Court of Appeals simply issued a form order denying leave to appeal. And the Michigan Supreme, noticing the trial court's error, remanded the case to the trial court which again, only addressed the claims from the murder trial. Thus, although Lee raised them repeatedly, at no point during state collateral review did any of the state courts adjudicate the merits of Lee's claims.

Because Lee's claims were not adjudicated on the merits, the deferential standard of § 2254(d) does not apply. *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003) (no adjudication on the merits where trial court declined to review claim on post-conviction review under erroneous belief that the claim had already been decided against Petitioner on direct appeal).

### III.

The Court will first address whether Lee's claims are subject to procedural default for failure to exhaust state court remedies. The warden contends that Lee was required to appeal the trial court's second order denying his motion for relief from judgment after making the same mistake it had made earlier. Lee responds that the exhaustion requirement only requires a habeas petitioner to give all levels of state review one fair shot, which he did.

A state prisoner filing a petition for a writ of habeas corpus must first exhaust all state court remedies. 28 U.S.C. §2254(b) and (c). He satisfies the requirement by giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). The wrinkle presented in this case is whether the Michigan Supreme Court ever had a full opportunity to resolve Lee's claims where the only order it was asked to review had erroneously conflated the two sets of convictions. Under Michigan law, an appellate court will generally not decide an issue where the court below overlooked a critical issue or failed to make some necessary finding. *See, e.g.*, *Paramount Pictures Corp. v. Miskinis*, 344 N.W.2d 788, 799 (Mich.1984); *Gilbert v. Sabin*, 256 N.W.2d 54, 60 (Mich. App. 1977). In such circumstances, the court remands the case, and then it will consider the case again if a further appeal arises.

What happens, though, when the trial court swings and misses a second time? Neither party cites any authority addressing this situation, and whether exhaustion requires a defendant in those

circumstance to go through yet another round of appeals. The Court need not decide this issue, however, because procedural default is not a jurisdictional bar to review of a habeas petition on the merits. *See Trest v. Cain*, 522 U.S. 87, 89 (1997). "[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F. 3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). It may be more economical for the habeas court to simply review the merits of a habeas petitioner's claims, "for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. This is such a case.

## IV.

### A.

Lee's first claim asserts that his Sixth Amendment right to a public trial was violated when the trial court cleared the courtroom of members of the public during jury selection without determining whether reasonable alternatives existed. Lee's related fifth habeas claim asserts that his trial counsel rendered ineffective assistance of counsel by failing to object to the closure. Respondent asserts that Lee waived this claim when he made no contemporaneous objection and raised this issue for the first time in post-conviction proceedings.

The record indicates that on the first morning of trial, the court directed one-hundred and twenty prospective jurors to be brought into the courtroom for the joint trial, as the two defendants required separate juries. The court appeared to have cleared the courtroom: "Okay. So, I need everyone to step outside, because I need to bring in all of these jurors, okay? One-hundred and twenty individuals." (ECF No. 5-3, PageID.156.) The record does not indicate who "everyone" included. The court then read preliminary instructions to the prospective jurors, and it divided them

into two groups – one for each defendant. Co-defendant Cain's group was excused for the rest of the day, and Lee's group was directed to return after a lunch break for jury selection. (*Id.*, PageID.178.) When the jury selection proceeding commenced after lunch, the court did not indicate whether members of the public were allowed back in the courtroom. (*Id.*, PageID.186.) At no point during the proceeding did Lee object to the closure of the courtroom. (*See id.*, PageID.186–311.)

The Sixth Amendment guarantees the criminally accused a trial open to the public. *Waller v. Georgia*, 467 U.S. 39, 46 (1984). If a party wishes to close a criminal trial to the public it "must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Waller*, 467 U.S. at 48. When a violation of the public-trial guarantee occurs, it is considered a structural trial error that is not subject to harmless error analysis. *Id.*, at 49–50 and n.9.

In *Presley v. Georgia*, 558 U.S. 209, 210 (2010), the defendant's uncle was asked to leave the courtroom during jury selection. Defense counsel objected and asked for some accommodation to be made. The trial court denied the request, stating there was "no need" for the family member to be present, and the court did not want him to intermingle with members of the jury venire. *Id.* The Supreme Court held that the right to a public trial extended to the jury selection proceeding, and the defendant's Sixth Amendment right to a public trial was violated when the trial court failed to consider reasonable alternatives to removing the family member from the courtroom. 558 U.S. at 216. Petitioner asserts that here, as in *Presley*, the court removed members of the public (including his family members) from the courtroom during jury selection without considering reasonable alternatives.

The key distinction between Lee's case and *Presley* is that Lee failed to object when the trial court ordered the closure. A defendant is only entitled to automatic reversal due to the closure of the courtroom if he raises the issue at trial and then on direct appeal. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1903 (2017) (citing *Neder v. United States*, 527 U.S. 1, 7 (1999) (defendant entitled to automatic reversal for violation of right to public trial during jury selection, "[i]f an objection is made at trial and the issue is raised on direct appeal[.]"); *Peretz v. United States*, 501 U.S. 923, 936 (1991) (citing *Levine v. United States*, 362 U.S. 610, 618 (1960) for the proposition that "failure to object to closing of courtroom is waiver of right to public trial.").

*Weaver* explained the rationale behind the automatic reversal rule as applying only when an objection is raised at trial:

> [W]hen a defendant objects to a courtroom closure, the trial court can either order the courtroom opened or explain the reasons for keeping it closed.

> \*   \*   \*

> Furthermore, when state or federal courts adjudicate errors objected to during trial and then raised on direct review, the systemic costs of remedying the error are diminished to some extent. That is because, if a new trial is ordered on direct review, there may be a reasonable chance that not too much time will have elapsed for witness memories still to be accurate and physical evidence not to be lost. There are also advantages of direct judicial supervision. Reviewing courts, in the regular course of the appellate process, can give instruction to the trial courts in a familiar context that allows for elaboration of the relevant principles based on review of an adequate record. For instance, in this case, the factors and circumstances that might justify a temporary closure are best considered in the regular appellate process and not in the context of a later proceeding, with its added time delays.

137 S. Ct. at 1912 (internal citations omitted).

Accordingly, in a case like the present one, where the right to a public trial is not asserted contemporaneously with the closure, courts decline to apply the automatic reversal rule. *See Johnson v. Sherry*, 586 F.3d 439, 444 (6th Cir. 2009) (abrogated on other grounds) (citing *Freytag v. Commissioner*, 501 U.S. 868, 896 (1991) ("[T]he Sixth Amendment right to a trial that is

'public,' provide[s] benefits to the entire society more important than many structural guarantees; but if the litigant does not assert [it] in a timely fashion, he is foreclosed."); *Bucci v. United States*, 662 F.3d 18, 27–28 (1st Cir. 2011) (defendant forfeited claim that right to public trial violated in §2255 proceeding where he failed to object at trial); *United States v. Rivera*, 682 F.3d 1223, 1232 (9th Cir. 2012) (defendant may forfeit the right to a public trial, either by affirmatively waiving it or by failing to assert it in a timely fashion).

Here, Lee's counsel did not object to the trial court's direction "for everyone to step outside" to accommodate the large group of potential jurors and begin voir dire. (ECF No. 5-3, PageID.156.) And the record does not reveal if members of the public were allowed to reenter following the lunch break after the venire had been divided in two and the actual jury selection commenced. Nor does the record reveal whether "everyone" included every spectator. In other words, it is not clear from the record whether it was possible to accommodate all one-hundred and twenty jurors and some members of the public inside the courtroom. The failure to object deprived the trial court of the opportunity to consider whether a reasonable alternative existed apart from closing the courtroom or from correcting the error before it occurred. And the failure to object left the record unclear as to exactly which members of the public the trial court asked to leave, or when it allowed them to reenter. For all the record shows, any members of the public who were initially asked to leave were allowed to return after the lunch break when the actual jury selection proceeding was conducted. Lee's failure to object, in other words, left the record in a state that prevents the Court from determining whether his public-trial rights were violated at all, and it forecloses his claim to entitlement to automatic reversal.

Nor was the trial court required, as Lee asserts, to *sua sponte* make findings regarding reasonable alternatives to closure. *See Downs v. Lape*, 657 F.3d 97, 108 (2nd Cir. 2011) ("As both

*Presley* and *Waller* involved a trial court's response to a registered objection, neither decision requires courts to justify or consider alternatives to closure when . . . no objection is made."); *Addai v. Schmalenberger*, 776 F.3d 528, 534 (5th Cir. 2015) ("However, this is not a case in which a party objected to the closure, which would require the procedure in *Waller*.").

Lee makes much of Respondent's characterization of what happened as amounting to a "waiver" of his right to a public trial. *See* ECF No. 16. He asserts that since *United States v. Olano*, 507 U.S. 725, 733 (1993), the Supreme Court has drawn a sharp distinction between the "waiver" of a right, which occurs by "intentional relinquishment", and the  "forfeiture" of a right, which occurs when a party merely fails to assert a right. *Id.* at 733 (citations omitted). Lee asserts that his failure to raise his right to a public trial fell short of a waiver, and that public-trial cases failing to grant an automatic reversal in situations of mere forfeiture, as here, are no longer good law in light of *Olano*.

There are at least two problems with this argument. First, *Olano* recognized that unpreserved claims presented to federal courts on direct appeal are "forfeited" even if the right was not expressly "waived," and therefore subject on direct appeal to limited plain-error review. *Id.*, 507 U.S. at 735–736. *Olano* did not remove "forfeited" structural-error claims from the class of "waived" claims and place them in the category of preserved claims that warrant automatic reversal. Second, if *Olano* created the sea-change that Lee claims it did, then it would be impossible to make sense of *Weaver*, where the Court said the automatic-reversal rule of a violation of the right to a public trial applied "where there is an objection at trial and the issue is raised on direct appeal[.]" 137 S. Ct. at 1910. Federal courts after *Olano* do not automatically reverse federal criminal convictions based on unpreserved claims of the denial of the right to a public trial. Rather, they apply plain error review. *See, e.g., United States v. Anderson*, 881 F.3d 568 (7th Cir. 2018).

14

In any event, whether characterized as a "wavier" or a forfeiture" by courts, the salient point is that in order to be entitled to automatic reversal, a defendant must object at trial to the closure of a courtroom at trial, and Lee did not. Instead of automatic reversal, courts in this situation apply plain-error review. Courts "should correct a plain forfeited error affecting substantial rights if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736 (cleaned up). Lee has failed to show that the closure of the courtroom—whether it extended only to the short portion of the proceedings when the two jury pools were divided, whether it even extended to all members of the public, or whether it persisted after the lunch break when the actual jury selection began—seriously affected the fairness, integrity, or public reputation of the trial. *See Johnson v. United States*, 520 U.S. 461, 469–470 (1997) (discussing how plain error review applies to unpreserved claims of structural error). Indeed, because Lee relies on the right to automatic reversal, he presents no argument as to how the specific closure in his case seriously affected his trial. So his first claim does not warrant relief.

Lee also asserts that his trial attorney rendered ineffective assistance of counsel by failing to object to the closure of the courtroom. The Supreme Court in *Weaver* held that, even assuming that a failure to object to a courtroom closure is deficient performance, prejudice is not presumed, and a petitioner must demonstrate that his defense was actually prejudiced by the failure to object. 137 S. Ct. at 1910 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Again, Lee makes no attempt to demonstrate actual prejudice from the closure of the courtroom to accommodate the two juror pools. He fails to present any argument that there is a reasonable probability that the result of his trial would have been more favorable had an objection been made.

Accordingly, Lee has failed to demonstrate entitlement to habeas relief on either his first or fifth claims.

**B.**

Lee also believes that the trial court lacked impartiality and alleviated the prosecutor's burden of proof by referring to the complainants as "victims" and referring to the "scene of the occurrence."

"[T]he Due Process Clause clearly requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) (internal quotation marks and citation omitted). An impartial judge is a necessary component of a fair trial. *In re Murchison*, 349 U.S. 133, 136 (1955). The Supreme Court established the standard for assessing claims of judicial bias in *Liteky v. United States*, 510 U.S. 540 (1994). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id*. at 555. A judge's remarks that are "critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id*.

While Lee does not refer the Court to any place in the record where the trial court called the complainants "victims," Respondent identifies two occurrences during jury selection. On the first occasion, the judge asked a potential juror whether the fact that "the accused is young, as well as the victims are age eighteen and twenty" would affect his impartiality. (ECF No. 5-3, PageID.248.) On the second occasion, the judge cautioned the jurors about the seriousness of the case, stating, "God forbid that somebody has to be where Mr. Lee is, or where the victims are." (*Id.*, PageID.293-94.) In preliminary instructions to the jury, the court stated: "You must not visit the scene of the occurrence that is the subject of this trial." (ECF No. 5-4, PageID.329.)

It was undisputed at trial that the car occupied by the complainants was shot at, and that one of the women was struck in the head with a bullet or bullet fragment. The two women were

later abducted and murdered. The question at trial was Lee's identity as one of the perpetrators of the assault. But whether Lee was involved or not, there was no dispute at trial that the two women were "victims" of violent crime. *See, e.g.*, *Guster v. McKee*, 2009 WL 2444327, at *10 (E.D. Mich. Aug. 7, 2009) (trial court's referral to the complaining witness as "the victim" was not error). The same holds true for the reference to the "scene of the occurrence." A shooting occurred at a particular location that had to be mentioned. Lee fails to demonstrate how these comments were so prejudicial as to indicate bias by the trial judge or deprive him of a fundamentally fair trial.

Finally, the court read curative instructions to the jury regarding any comments made by the court or the attorneys. (ECF No. 5-4, PageID.324; ECF No. 5-10, PageID.1294.) These instructions reduced any potential prejudicial impact of comments made by the trial judge. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Lee's second claim does not warrant habeas relief.

## C.

Lee's third habeas claim asserts that he was constructively denied his Sixth Amendment right to counsel due to his trial attorney's failure to conduct any pretrial investigation by interviewing the prosecutor's witnesses.

In *United States v. Cronic*, 466 U.S. 648 (1984), the Supreme Court recognized a class of cases in which Sixth Amendment violations are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id*. at 658. For example, this occurs when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id*. Lee claims that his counsel's pretrial conduct falls into this category.

But Lee makes no attempt to develop this argument. Other than an argument heading in the petition, (See ECF No. 8, PageID.1962), Lee does not cite to any part of the record or state any facts tending to show a complete failure of counsel to prepare for trial. On state post-conviction

17

review, where he first raised this claim, Lee asserted in conclusory fashion: "[d]espite being fully aware of the [prosecution] witnesses' existence and identities, counsel never bothered to investigate or conduct pretrial preparatory investigative interviews of any of these witnesses." (ECF No. 5-14, PageID.1760.) There, too, Lee did not support this claim with any offer of proof or other attempt at factual development. Lee's failure to support his claim with specific factual allegations, by itself, is grounds for denying relief. *See Cross v. Stovall*, 238 F. App'x 32, 39-40 (6th Cir. 2007); *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (conclusory allegations of ineffective assistance of counsel do not justify habeas relief); *see also Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (bald assertions and conclusory allegations do not provide a basis for evidentiary hearing on habeas review).

But in addition, the trial record belies the claim. Defense counsel's cross examination of the prosecution witnesses indicates that he was well prepared for trial and for the witnesses' testimony. Counsel was familiar with the witnesses' pretrial statements and used them to challenge their trial testimony. (*See, e.g.*, ECF No. 5-4, PageID.425–426, 427, 443; ECF No. 5-5, PageID.656–657; ECF No. 5-6, PageID.745–747, 762, 790, 848; ECF No. 5-7, PageID.896, 961, 1017; ECF No. 5-9, PageID.1166–86.) Counsel was likewise familiar with and made use of witnesses' preliminary examination testimony. (See, e.g., ECF 5-5, PageID.659; ECF 5-7, PageID.897–898, 963.) Counsel was familiar with and made use of the medical records. (ECF 5-5, PageID.529–30.) And counsel was familiar with and made use of the police reports. (*See e.g.*, ECF No. 5-4, at PageID.483-484.) The *Cronic* standard applies only to cases where the collapse of the adversarial system is imminently clear. *Moss v. Hofbauer*, 286 F.3d 851, 860 (6th Cir. 2002). Any fair reading of the record shows that defense counsel prepared for trial and effectively

contested the prosecutor's case. Lee has failed to demonstrate that he was constructively denied counsel under *Cronic*.

## D.

Lee next asserts that his counsel was ineffective because he failed to request the standard jury instruction that a joint trial was not evidence of Lee's own guilt. The standard Michigan jury instruction provides:

> [Defendant] and [Co-Defendant] are both on trial in this case. The fact that they are on trial together is not evidence that they were associated with each other or that either one is guilty. You should consider each defendant separately. Each is entitled to have [his/her] case decided on the evidence and the law that applies to [him/her]. [If any evidence was limited to (one defendant / some defendants) you should not consider it as to any other defendants.]

Michigan CJI 2d 3.7 (bracketed text in original). The court did not give this instruction.

To establish that he received ineffective assistance of counsel, a petitioner must show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Even assuming, without deciding, that Lee's counsel was deficient when he failed to request the jury instruction for joint criminal trials, the Court finds no prejudice given the trial court's other instructions to the jury. During the jury voir dire, the trial court instructed the jury that although the court would conduct a joint trial for Cain and Lee, the jurors would deliberate separately for each defendant and should "determine th[e] case solely on the evidence, and not by mere association." (ECF No. 5-3, PageID.246.) After the close of evidence, the trial court instructed the jury on the presumption of innocence and the prosecutor's burden of proof. (ECF No. 5-10, PageID.1293.) The jury was instructed only to consider the evidence presented at trial, and they were instructed on what things constituted evidence. (*Id.*, PageID.1295.) And the trial court instructed the jury that Lee's mere presence at the scene of the crime was not a basis for

finding him guilty. (ECF No. 5-10, , PageID.1306.) Lee and his co-defendant had separate juries. Lee's jury was not asked to determine the co-defendant's guilt, greatly reducing the possibility that they would consider co-defendant's guilt as a basis for convicting Lee by association.

Lee has not shown how he was prejudiced by the omission of the specific jury instruction he now relies on. This fourth claim is without merit.

## E.

In his final claim, Lee asserts that his appellate counsel was ineffective for failing to raise the foregoing issues in the Michigan Court of Appeals during his appeal of right. But appellate counsel cannot be ineffective for failure to raise an issue that lacks merit. *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001); *Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."). Because all of Lee's underlying claims are without merit, his appellate counsel was not ineffective for failing to raise them on direct review.


## V.

As set forth above, none of Lee's claims warrant habeas relief. Thus, the petition will be denied. It follows that there is no basis for Lee's request for bond and that motion is denied as well.

## VI.

Before Lee may appeal this decision, the Court must determine whether to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Lee must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have

been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). The Court finds that no reasonable jurist would debate whether Lee should be granted habeas corpus relief on any of his claims. The Court will therefore deny a certificate of appealability.

## VII.

Accordingly, the Court DENIES WITH PREJUDICE the petition for a writ of habeas corpus (ECF No. 1), DENIES a certificate of appealability, and DENIES the motion for release on bond as moot (ECF No. 18).

SO ORDERED.

Dated: September 14, 2020

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE